**THIRD DIVISION
DILLARD, P. J.,
GOBEIL and PIPKIN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.gov/rules**

**July 2, 2026**

# In the Court of Appeals of Georgia

A26A0599. SINCLAIR, INC. d/b/a SINCLAIR BROADCAST
    GROUP v. AMIN.

GOBEIL, Judge.

Appellee Mahendra Amin, M. D., sued appellant Sinclair, Inc. d/b/a Sinclair Broadcast Group ("Sinclair") and Dawn Wooten for defamation after Sinclair aired a broadcast in which journalist Sharyl Attkisson interviewed Wooten about conditions at a detention center in Irwin County. Sinclair moved to strike Amin's complaint pursuant to OCGA § 9-11-11.1, Georgia's anti-Strategic Lawsuit Against Public Participation ("anti-SLAPP") statute. The trial court denied the motion, and Sinclair now appeals. Because we agree with Sinclair that the broadcast was not "of and concerning" Amin, we reverse.

"This Court reviews a trial court's ruling on an anti-SLAPP motion to strike de novo, viewing the pleadings and affidavits submitted by the parties in the light most favorable to the plaintiff (as the non-moving party)." *Giraldi v. Bowen*, 374 Ga. App. 347, 348 (912 SE2d 724) (2025) (quotation marks omitted).

So viewed, the record shows the following. On March 5, 2023, an episode of a television news program, "Full Measure with Sharyl Attkisson," was broadcast on Sinclair television stations. In that episode, Attkisson interviewed Wooten, a nurse who worked at the the Irwin County Detention Center ("ICDC"), who claimed that in 2020, female detainees at the facility reported undergoing "mysterious surgical procedures" that "they did not fully understand." After Wooten's initial inquiries went unanswered, Wooten worked with a whistleblower group to file complaints with various federal agencies. Wooten claimed that a number of sterilization procedures, including hysterectomies, ovary removal, and tubal ligation, were being performed on ICDC women in the custody of United States Immigration and Customs Enforcement ("ICE") without their knowledge or consent. The episode also discussed eugenics and recounted forced sterilization procedures (throughout history) that were performed on various groups of women without their full or informed consent. In

addition, the broadcast quoted language from a 2022 Senate committee report, entitled "Medical Mistreatment of Women in ICE Detention," with Attkisson stating: "A Senate committee in November concluded that 'female detainees [at the Irwin County Detention Facility] appear to have undergone excessive, invasive, and often unnecessary gynecological procedures.'"

Dr. Amin subsequently filed a complaint for defamation against Sinclair and Wooten, alleging that the broadcast was "of and concerning" him and contained false statements that accused him of performing mass hysterectomies on immigrant women housed at the ICDC that were not medically necessary and were performed without their knowledge or consent. He characterized the broadcast's statements as "convey[ing] to the average viewer that Dr. Amin was an evil doctor seeking to carry out a sterilization campaign on immigrant women detained at ICDC." Specifically, Amin challenged the following statements from the broadcast:

> [Wooten]: They would leave, go get treatment, and they would return back to this facility to be monitored. They would talk about the incisions that they had had or would have on their abdomen laparoscopically, and they realized that there was invasive procedures that were done.

[Attkisson: "What procedures were they doing?"] [Wooten]: Hysterectomies, and tubal ligations and tubal removals, ovary removals, D & Cs.

[Wooten]: According to the records that were found and released, they were being sterilized without their consent.

[Attkisson: "How many women did you know of that this impacted?] [Wooten]: We're talking 30 to 50.

[Wooten]: What I saw was the inhumane treatment of human beings and lives being — decisions made for without consent.

[Attkisson]: A whistleblower who exposed alleged medical abuses of prisoners that evoke images of another era, when women deemed to be unfit, for whatever reason, were sterilized without their knowledge or with coerced consent.

[Attkisson]: But Wooten's most startling discovery was yet to come. It came when women inmates at the Irwin County Detention Center began approaching her, asking about mysterious surgical procedures they were getting that they did not fully understand.

[Attkisson]: She says a doctor was performing life-changing surgeries on the women that they say they didn't want or properly consent to.

[Attkisson]: So you're saying that physicians were sterilizing these women without their permission or unbeknownst to them?

[Attkisson]: To Wooten, she was seeing shades of that past with illegal immigrant women at the Irwin County Detention Center.

Dr. Amin, who completed his residency in gynecology and has practiced medicine in Georgia for over 35 years, provided gynecological care for detainees housed at ICDC. Dr. Amin averred that he only performed two hysterectomies on ICDC patients and both were medically necessary, and he stated that he did not perform tubal ligation on any ICDC detainee. He also maintained that all procedures performed on ICDC detainees must be pre-approved as medically necessary and that he obtained informed consent for each procedure he performed.

As part of his complaint, Dr. Amin noted that the Senate report had concluded that only two hysterectomies were performed, both medically necessary. That conclusion, however, was not mentioned in the broadcast. Notably, although the Senate report thoroughly discussed Amin's work in connection with detainees held at ICDC, the broadcast at issue did not mention him, or any physician or hospital affiliation, by name.

5

Sinclair filed a motion to strike pursuant to OCGA § 9-11-11.1(b)(1),[1] arguing in part that Dr. Amin was a limited purpose public figure, and the parties conducted discovery on the issue of Sinclair's "actual malice." Sinclair raised several additional arguments, including that Amin could not show that the episode was about him, thus failing to establish the "of and concerning" element of defamation.

Following a hearing, the trial court denied the motion to strike. Specifically, the trial court found that the challenged statements are capable of being proven false; the statements are "of and concerning" Amin; Amin demonstrated actual malice; and Amin was a private figure. The court therefore determined that Dr. Amin had stated a claim for defamation supported by a prima facie showing of facts. This appeal followed.

1. For background, and as this Court has explained, "[a] SLAPP, or Strategic Lawsuit Against Public Participation, is a meritless lawsuit brought not to vindicate legally cognizable rights, but instead to deter or punish the exercise of constitutional rights of petition and free speech by tying up its target's resources and driving up the

---

[1] Wooten also filed a motion to strike pursuant to OCGA § 9-11-11.1. In its order denying Sinclair's motion to strike, the trial court noted that actual malice discovery had not yet been conducted in connection with Wooten, and thus her motion was not yet ripe for consideration, so she is not a party to this appeal.

costs of litigation." *Giraldi*, 374 Ga. App. at 347. "Georgia's anti-SLAPP statute, OCGA § 9-11-11.1, allows a defendant to move to strike or dismiss such a frivolous action as an avenue for ending the suit quickly, summarily, and at minimal expense." Id. at 347-48. The General Assembly codified the purpose in OCGA 9-11-11.1(a), finding and declaring "that it is in the public interest to encourage participation by the citizens of Georgia in matters of public significance and public interest through the exercise of their constitutional rights of petition and freedom of speech." And further, this subsection further "finds and declares that the valid exercise of the constitutional rights of petition and freedom of speech should not be chilled through abuse of the judicial process." Id. To that end, the anti-SLAPP statute covers

> any claim for relief against a person or entity arising from any act of such person or entity which could reasonably be construed as an act in furtherance of the person's or entity's right of petition or free speech under the Constitution of the United States or the Constitution of the State of Georgia in connection with an issue of public interest or concern.

*Lane Dermatology v. Smith*, 360 Ga. App. 370, 378(2) (861 SE2d 196) (2021). And the General Assembly has directed that OCGA § 9-11-11.1 is to be broadly construed to

give effect to its stated purpose. *Joshua David Mellberg, LLC v. Impact Partnership, LLC*, 355 Ga. App. 691, 693 (844 SE2d 223) (2020).[2]

Bearing the foregoing in mind, the analysis of an anti-SLAPP motion involves two steps. *Wilkes & McHugh, P.A. v. LTC Consulting, L.P.*, 306 Ga. 252, 261(2)(b) (830 SE2d 119) (2019). First, the court must decide whether the party filing the anti-SLAPP motion "has made a threshold showing that the challenged claim is one arising from protected activity." Id. at 262(2)(b) (quotation marks omitted). "If a court concludes that this threshold showing has been made, it must proceed to the second step of the analysis and decide whether the plaintiff has established that there is a probability that the plaintiff will prevail on the claim." Id. (quotation marks omitted).

The parties do not dispute that under the first part of this test, Amin's defamation claim arises from protected activity by Sinclair. Thus, the primary issue

---

[2] Though in a different anti-SLAPP context (involving a public official and application of the test set forth in *New York Times v. Sullivan*, 376 US 254 (84 SCt 710, 11 LE2d 686) (1964)), the Supreme Court of Georgia has recognized shortcomings of anti-SLAPP laws. *Am. Civil Liberties Union v. Zeh*, 312 Ga. 647, 652(1)(b) n. 5 (864 SE2d 422) (2021). Referring to U.S. Supreme Court jurisprudence, the Court acknowledged the U.S. Supreme Court's concern with "the negative effects its doctrine may have on incentives to speak the truth as well as the unfairness that may result to public figures about whom falsehoods are published ... ." Id. Yet, the Supreme Court of Georgia noted that the U.S. Supreme Court ultimately "has deemed those consequences outweighed by the need to avoid self-censorship[.]" Id.

in this case is whether Amin has met his burden of establishing that there is a probability that he will prevail on his defamation claim.

> To meet this burden, the plaintiff must demonstrate that the complaint is both legally sufficient and supported by a sufficient prima facie showing of facts to sustain a favorable judgment if the evidence submitted by the plaintiff is credited. The plaintiff's evidence is accepted as true; the defendant's evidence is evaluated to determine if it defeats the plaintiff's showing as a matter of law.

*Wilkes & McHugh, P.A.*, 306 Ga. at 262(2)(b) (citation modified).

> Under Georgia law, a claim for defamation has four elements:
>
> (1) a false and defamatory statement *concerning the plaintiff*; (2) an unprivileged communication to a third party; (3) fault by the defendant amounting to at least negligence; and (4) special harm or the actionablity of the statement irrespective of special harm.

*Mathis v. Cannon*, 276 Ga. 16, 20-21 (573 SE2d 376) (2002) (quotation marks omitted; emphasis supplied).

Sinclair argues that the trial court erred by finding that the broadcast was "of an concerning" Amin. Because this issue is dispositive of this appeal, we address it first.

To sustain an action for [defamation], the allegedly defamatory words must refer to some ascertained or ascertainable person, and that person must be the plaintiff. If the words used really contain no reflection on any particular individual, no averment or innuendo can make them defamatory. An innuendo cannot make the person certain which was uncertain before.

*Cox Enters. v. Bakin*, 206 Ga. App. 813, 816(1) (426 SE2d 651) (1992) (citation modified). "A publication claimed to be defamatory must be [viewed] and construed in the sense in which the [viewers] to whom it is addressed would ordinarily understand it." Id. Put another way, in considering whether a publication is defamatory as a matter of law, "we look not at the evidence of what the extrinsic circumstances were at the time indicated in the [publication], but at what construction would be placed on it by the average [viewer]." Id. at 818(1).

The parties contest whether the statements described above are actionable as referencing Dr. Amin. The segment featuring Wooten begins by describing her allegations that, in 2020, personnel at ICDC were shredding documents related to the COVID-19 pandemic. The broadcast then goes on to describe that "Wooten's most startling discovery was yet to come." Aside from the reference to onset of the COVID-19 pandemic in 2020, the episode does not include any other specific date,

10

nor does it include a time frame as to when the allegedly improper medical procedures were performed.

It is undisputed that Dr. Amin is not named in the episode. The episode makes a single reference to "a doctor [ ] performing life-changing surgeries on the women that they say they didn't want or properly consent to." Immediately after this statement, Attkisson asks Wooten: "What procedures were *they* doing?" She then asks Wooten: "So you're saying that *physicians* were sterilizing these women without their permission and unbeknownst to them?" Nevertheless, Amin contends the broadcast was "of and concerning" him because he previously had a practice in Ocilla, Irwin County, had treated ICDC detainees, and he had often been the only gynecologist in Irwin County — thereby he concludes that he is the only person the episode could be referencing. As noted earlier, "[i]f the words really contain no reflection on any particular individual, no averment or innuendo can made them defamatory" and "[a]n innuendo cannot make the person certain which was uncertain before." *Cox Enters.*, 206 Ga. App. at 816(1). Further, although the trial court described that Amin "is the only known provider of gynecological care for women

11

detained at ICDC," this information does not appear in Dr. Amin's affidavit.[3] Under these circumstances, we disagree that Amin was ascertainable from the broadcast alone. See *Koncul Enterprises v. Fleet Fin.*, 279 Ga. App. 39, 42(2) (630 SE2d 567) (2006) (affirming grant of summary judgment in favor of finance company who furnished account balance statements to mortgagor; even if balance statements included inaccurate payoff amounts, statements were not defamatory because "on their face" such communications made no reference to plaintiff homebuilder); *Cox Enters.*, 206 Ga. App. 816-17(1) (holding that the newspaper articles that did not refer to physician by name or innuendo were not defamatory, even though the same publisher had released other articles including the physician's name); *Armscorp of Ame. v. Daugherty*, 191 Ga. App. 19, 19-20 (380 SE2d 729) (1989) (affirming grant of summary judgment in defamation action stemming from magazine advertisement because advertisement did not name or refer directly to plaintiff gun manufacturer). It follows that because Amin cannot demonstrate a likelihood of success on the merits of his defamation claim, the trial court erred by denying Sinclair's motion to strike.

---

[3] Likewise, in his brief on appeal, Dr. Amin has not directed this Court to other instances in the record that would support the trial court's statement that he was the only known provider of gynecological care to women detained at ICDC.

2. Based on the foregoing, we do not consider Sinclair's remaining arguments.

*Judgment reversed. Dillard, P. J., and Pipkin, J., concur in judgment only.*